**SECOND DIVISION**
**BARNES, P. J.,**
**MILLER, and RAY, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

January 24, 2014

# In the Court of Appeals of Georgia

A13A2296. MASON v. THE STATE.

BARNES, Presiding Judge.

A jury convicted Charles Edwin Mason of one count of burglary, one count of criminal trespass, two counts of possession of tools for the commission of a crime, one count of felony theft by taking, and two counts of forgery in the second degree. The trial court denied his motion for new trial, resulting in the present appeal in which Mason argues that the trial court erroneously denied his right to self-representation and failed to discharge his trial counsel; that his trial counsel rendered ineffective assistance; and that his prior convictions were improperly admitted for the purpose of impeachment. For the reasons set forth below, we affirm.

"Following a criminal conviction, the defendant is no longer presumed innocent, and we view the evidence in the light most favorable to sustain the verdict." *Anthony v. State*, 317 Ga. App. 807 (732 SE2d 845) (2012). Guided by this standard, we turn to the evidence presented in this case.

*The Furnished Townhouse Break-In.* In the early morning hours of June 21, 2011, police officers were dispatched to a residential address in Cobb County in response to a security alarm that had been triggered. The address was for a furnished model townhouse in a newly built subdivision. The responding officers discovered that a side window to the townhouse had been pushed open and had glove prints on it. Upon entering the townhouse, the officers noticed that a television had been removed from a bracket on the living room wall and had been taken from the home. In an upstairs bedroom, the officers noticed that another television had been moved, as if someone had attempted to remove it from the wall bracket. Some of the bedding from the master bedroom also had been taken.

When the officers continued their search outside the townhouse, they discovered a flat screen television together with a pillow and comforter in the bushes. The pillow and comforter matched the bedding that had been taken from the master bedroom, and a salesperson employed by the subdivision developer who had an office in the furnished townhouse identified the television as the one that had been mounted on the living room wall. Believing that the perpetrator might still be in the area, more officers and the tactical SWAT unit arrived to establish a perimeter around the

2

subdivision and to check neighboring townhouses. A K9 unit also arrived at the scene but was unable to track a scent.

*The Vacant Townhouse Break-In.* As the tactical SWAT team searched a vacant townhouse located a few doors down on the same road in the subdivision, they noticed that a string to the attic door was swaying and that there was some insulation on the carpet floor below the door. When one of the officers looked around the attic, he noticed something red protruding from the white insulation. Believing that someone was hiding underneath the insulation, the officer ordered the person to show his hands. The person hiding in the insulation was Defendant Mason, who complied with the officer's directive and started to move toward him. As Mason approached the officer, he stepped on the drywall between the wooden trusses and fell through the ceiling into a bathtub right below the attic. Another officer immediately apprehended Mason.

In the attic near where Mason had been hiding, officers found a ball cap, a pair of work gloves, and a backpack. Inside the backpack were several items, including a television power cord that fit the television found in the bushes and a pair of needle-nose pliers. The weave and texture on the palms of the work gloves appeared

consistent with the prints found on the side window of the furnished townhouse that had been burglarized.

Later that morning, the police were called back to the vacant townhouse to retrieve additional items that had been discovered there. A project manager for the subdivision had been repairing the bathroom in the townhouse and had discovered a wallet, a personal check, and a set of keys underneath the insulation that had fallen into the bathtub where Mason crashed through the ceiling. A second personal check subsequently was found underneath the insulation by a worker repairing the drywall.

The wallet found in the bathtub contained the driver's license of an individual named Reginald Degraffenreaidt and a Strayer University identification card that had his name but Mason's photo on it. Further investigation revealed that Degraffenreaidt did not know Mason, and that his wallet recently had been stolen from the armrest of his vehicle.

*The First Forged Check.* The first check found in the bathtub belonged to an individual named Brett Barksdale, who did not realize that his check was missing until he was contacted by the police. Barksdale kept his checkbook in the glove compartment of his car, and the missing check had been removed from the middle of his checkbook. The check was made payable to Reginald Degraffenreaidt and was

signed, but Barksdale did not know Degraffenreaidt and the signature on the check was not his. According to Barksdale, the check had been blank the last time it was in his possession.

*The Second Forged Check.* The second check belonged to an individual named Remy Bulbekian, who also did not realize that he was missing the check until contacted by the police. The check had been removed from the middle of his checkbook in his car. Like the first check, the second check was made payable to Reginald Degraffenreaidt and was signed. Bulbekian testified that he did not know Degraffenreaidt, the signature on the check was not his, and the check had been blank the last time it was in his possession.

*The Car, Tools, and Stolen Laptop Computer.* After he was arrested and informed of his rights, Mason told the police that his girlfriend had dropped him off in the subdivision after they had fought. However, the detective assigned to the case believed that the set of keys found underneath the insulation in the bathtub might belong to a getaway car parked near the subdivision, which was gated and could not be driven into at night. The detective took the keys with him to an apartment complex located next to the subdivision and pressed the alarm activator on the key chain to see if it matched any cars. The keys activated the alarm on a Nissan Sentra parked in the

5

complex approximately 200 to 300 feet from the furnished townhouse. The car was registered to Mason's girlfriend, and Mason later admitted that he had borrowed the car from her on the night of the break-ins.

The detective had the car impounded and obtained a search warrant. While executing the warrant, the police found a wallet in the driver's side door containing a driver's license, Social Security card, and credit cards belonging to Mason. In the trunk, the police found a crowbar, a pry bar, bolt cutters, a screwdriver, a set of hand trucks, a laptop computer inside a bag, and a flat screen television wrapped in a blanket. Based on his experience and expertise, the detective opined that tools such as a crow bar, a pry bar, and bolt cutters are often used in burglaries to break locks and force open doors.

While the detective was unable to determine the owner of the television found in the car trunk, he determined that the laptop computer belonged to an individual named Paul Allen. Allen had been friends with Mason when they were teenagers, and Mason had lived in Allen's home at one point. Allen's home in DeKalb County had been burglarized in 2010 and several items had been stolen, including the computer.

The detective also discovered a thumb drive inside the laptop computer bag. The thumb drive contained several images, including an image of a Strayer University

identification card under the name of Reginald Degraffenreaidt with Mason's photo on it, an image of a photo of Mason, and an image of a fake signature for Degraffenreaidt. The images of the Strayer University identification card and of the photo of Mason on the thumb drive matched the fake identification card discovered in the wallet in the bathtub of the vacant townhouse.

*The Criminal Trial.* Following the police investigation, Mason was indicted and tried before a jury on two counts of burglary (one count for the break-in of the furnished townhouse and another count for the break-in of the vacant townhouse); two counts of possession of tools for the commission of a crime (one count for the work gloves found in the attic and another count for the crowbar, pry bar, and bolt cutters found in the car trunk); one count of theft by taking (for the laptop computer belonging to Allen); and two counts of forgery in the second degree (one count for the check belonging to Barksdale and another count for the check belonging to Bulbekian). At trial, the State called multiple witnesses who testified to the events as previously discussed, including witnesses pertaining to the two forged checks (Degraffenreaidt, Barksdale, and Bulbekian) and the stolen laptop computer (Allen), a representative of the developer of the townhouses, the project manager who discovered items in the bathtub, the responding police officers, and the lead detective.

7

The State also introduced evidence of a similar transaction. In the early morning hours of July 25, 2007, an officer on patrol observed Mason running across the road and between a set of houses in a Cobb County subdivision located approximately five miles from the subdivision in the present case. When Mason saw the officer, he attempted to hide in the woods but was quickly apprehended. At the time of his arrest, Mason was wearing a backpack that contained several items, including gloves, needle-nose pliers, screwdrivers, and a rachet set. Mason also had a credit card that belonged to another individual and a set of car keys.

Like in the present case, the officer pressed the car door activator on the key chain, and it activated the doors on a car parked in the driveway of a nearby vacant house in the subdivision. The car had been stolen. Inside the car, the officer found a laptop, digital camera, and a checkbook belonging to someone else. Those three items had been stolen the day before the incident from the owner's truck. While Mason initially denied any wrongdoing and claimed that he had been in the subdivision because his girlfriend had dropped him off to jog there, he ultimately pled guilty to possession of tools for the commission of a crime, theft by receiving stolen property, and theft by receiving a stolen vehicle.

After the State presented its similar transaction evidence and rested, Mason presented his theory of the case. The defense theory was that Mason had simply gone into the vacant townhouse to sleep after fighting with his girlfriend and had hidden in the attic upon seeing the police in the subdivision because he had a criminal record, was scared of returning to prison, and was currently on probation. Mason claimed that he was not involved in the burglary of the furnished townhouse and had seen two other men fleeing from the area that night; that he had obtained Degraffenreaidt's wallet and the two forged checks from a third party but had decided not to use them because he did not want to go back to prison; and that he had bought the laptop computer found in his girlfriend's car from a friend and was unaware that it had been stolen. In an effort to support these claims, the defense introduced – after obtaining a stipulation from the State regarding its admissibility – a police incident report reflecting that the tracking dog brought to the scene by the K9 unit had been unable to pick up a scent and thus was unable to track any scent from the furnished townhouse to anywhere else in the subdivision. Mason also elected to testify.

During the cross-examination of Mason, the State tendered – over objection from the defense that the convictions were unduly prejudicial – certified copies of several of Mason's prior convictions for impeachment purposes. The documents

9

tendered also included the sentences that Mason had received in those cases, but the defense did not object specifically to the admission of the sentencing sheets.

After the close of the evidence and charge of the court, the jury found Mason guilty on all counts of the indictment, except for the burglary count relating to the vacant townhouse. On that count, the jury found Mason guilty of the lesser included offense of criminal trespass. Mason filed a motion for new trial, alleging, among other things, that his appointed trial counsel should have been discharged from the case, that he should have been permitted to represent himself, and that his trial counsel rendered ineffective assistance in several respects. After conducting a hearing, the trial court denied Mason's motion, resulting in this appeal.

1. The evidence adduced at trial and summarized above was sufficient to authorize a rational jury to find Mason guilty beyond a reasonable doubt of the offenses for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Over the course of the case, Mason and his appointed counsel had a strained relationship. In a letter penned to the trial court before trial, Mason complained that his appointed counsel had tried to "muzzle" him during a hearing on his motion to suppress, expressed that he "no longer [felt] comfortable with his counsel," and stated

10

that he wanted his counsel "replaced immediately." Later, during the State's case-in-chief, Mason requested that his counsel be discharged from the case after the two had a heated argument over issues of trial strategy, but the trial court denied his request. Then, on the beginning of the third day of trial, Mason requested that he be permitted to represent himself. The trial court denied his request but appointed additional stand-by counsel to assist the defense. Subsequently, Mason complained to the trial court after his counsel got angry with him for asking so many questions and said to him, "I don't want to hear any more questions, I'm sick of you," but he did not request any relief from the court at that point.

On appeal, Mason raises two enumerations of error pertaining to the issue of appointed counsel. We will address each in turn.

(a) Mason first contends that he unequivocally asserted his constitutional right to represent himself at the beginning of the third day of trial and that the trial court erred in denying his request. We are unpersuaded.

"Both the federal and state constitutions guarantee a criminal defendant the right to self-representation. See *Faretta v. California*, 422 U.S. 806 (95 SCt 2525, 45 LE2d 562) (1975); 1983 Ga. Const., Art. I, Sec. I, Par. XII." *Thaxton v. State*, 260 Ga. 141, 142 (2) (390 SE2d 841) (1990). But to be timely, "[a] request for

self-representation must be made *before* trial." (Emphasis in original.) *Mallory v. State*, 225 Ga. App. 418, 422 (4) (483 SE2d 907) (1997). See *Thaxton*, 260 Ga. at 142 (2); *Stewart v. State*, 267 Ga. App. 100, 101 (1) (598 SE2d 837) (2004). It follows that "[t]he denial of such a request made after the beginning of trial is not reversible error [because a] defendant cannot frivolously change his mind in midstream by asserting his right to self-representation in the middle of his trial." (Citation and punctuation omitted.) *Mallory*, 225 Ga. App. at 422 (4). See *Thaxton*, 260 Ga. at 142 (2); *Coley v. State*, 272 Ga. App. 446, 448 (1) (612 SE2d 608) (2005); *Stewart*, 267 Ga. App. at 101 (1). Because Mason's request to represent himself was made in the middle of trial, the trial court did not err in denying it.

(b) Mason next contends that the trial court should have discharged his trial counsel (and presumably appointed new counsel) because the record demonstrates a "complete breakdown of communication" between them. Again, we are unpersuaded.

> The Sixth Amendment guarantees effective assistance of counsel, not preferred counsel or counsel with whom a meaningful relationship can be established. An indigent defendant is not entitled to have his appointed counsel discharged unless he can demonstrate justifiable dissatisfaction with counsel, such as conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between counsel and client. . . . We evaluate a trial court's decision

12

regarding whether to appoint new trial counsel for an indigent defendant under an abuse of discretion standard.

(Citations, footnotes, and punctuation omitted.) *Holsey v. State*, 291 Ga. App. 216, 218-219 (2) (661 SE2d 621) (2008).

A breakdown in communication between a defendant and his counsel must be extreme before it *mandates* that the trial court remove appointed counsel. For example, we have held that a disagreement between a defendant and his counsel over trial strategy "causing tension in their relationship" and leading the defendant to lose "confidence" in his counsel was insufficient to require the trial court to grant counsel's motion to withdraw from the case. See *Johnson v. State*, 283 Ga. App. 524, 528-529 (5) (642 SE2d 170) (2007). Likewise, our Supreme Court has held that a trial court did not err in refusing to discharge appointed counsel where the defendant "felt counsel had neglected and ignored him" but failed to show a complete breakdown in their communication. *Bryant v. State*, 268 Ga. 616, 617 (2), n. 4 (491 SE2d 320) (1997). Thus, tension in the attorney-client relationship, disagreements over trial strategy, and a general loss of confidence or trust in counsel are insufficient, without more, to demonstrate the type of complete breakdown in communication necessary to mandate the removal of counsel from the case.

13

The record reflects that Mason and his appointed counsel had a strained relationship and had several heated disagreements over trial strategy during the course of the case. Nevertheless, there is no evidence that these disagreements prevented Mason from having his version of events heard by the jury or otherwise inhibited counsel from providing an adequate defense on behalf of Mason. Indeed, the testimony of Mason's counsel at the hearing on his motion for new trial reflects that Mason communicated his version of events to trial counsel "from the beginning" and that counsel then tried to construct a defense around that version of events despite knowing that "there was a mountain of evidence against [his] client." Indeed, Mason's counsel ultimately was able to persuade the jury to convict Mason of the lesser included offense of criminal trespass rather than burglary for his entry into the vacant townhouse. Under these circumstances, the evidence did not establish a complete breakdown of communication between Mason and his counsel, and the trial court acted within its discretion in refusing to discharge counsel from the case.

3. Mason also contends that his trial counsel rendered ineffective assistance in several respects. To prevail on a claim of ineffective assistance under the two-pronged test set forth in *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984), "[Mason] must show that [his] counsel's performance

14

was deficient and that the deficient performance so prejudiced him that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different." (Citation and punctuation omitted.) *Anthony v. State*, 317 Ga. App. 807, 813 (4) (732 SE2d 845) (2012). Mason has failed to carry his burden with regard to any of his ineffective assistance claims.

(a) Mason first argues that his trial counsel was ineffective for failing to timely subpoena and secure the attendance of the K9 unit officer whose dog unsuccessfully attempted to locate and track a scent at the scene. We disagree and instead conclude that counsel's decision not to secure the officer's testimony was strategic and did not constitute deficient performance, and that Mason cannot show that he suffered any prejudice.

"It is well established that the decision as to which defense witnesses to call is a matter of trial strategy and tactics; tactical errors in that regard will not constitute ineffective assistance of counsel unless those errors are unreasonable ones no competent attorney would have made under similar circumstances." (Citations and punctuation omitted.) *Dickens v. State*, 280 Ga. 320, 321 (2) (627 SE2d 587) (2006).

15

As we have emphasized, "reviewing courts do not evaluate trial counsel's tactics and strategic decisions in hindsight." (Citation and punctuation omitted.) *Taylor v. State*, 318 Ga. App. 115, 117 (2) (a) (733 SE2d 415) (2012).

Based on a stipulation entered into with the State, Mason's trial counsel introduced a police incident report reflecting that the tracking dog brought to the scene by the K9 unit officer had been unable to pick up a scent that night. The incident report had been prepared by the K9 unit officer whom Mason now contends that his trial counsel should have subpoenaed for trial. However, at the hearing on Mason's motion for new trial, Mason's trial counsel testified that he decided to use the stipulated incident report in lieu of making further efforts to secure the officer's testimony because he believed that the report would be more favorable to the defense. Trial counsel explained that the stipulated incident report was a "short blurb paragraph" that was "[v]ery positive for [his] client" which he was able to "turn" and "twist" to his advantage in his closing argument to assert that the dog should have found Mason if he had broken into the furnished townhouse. In contrast, trial counsel, based on his 37 years of experience as an attorney, believed that "there would probably be some hems and haws about what happened" if the officer himself had testified. Trial counsel went on to explain that if the State had not stipulated to the

16

admissibility of the incident report, he would have asked the trial court to secure the officer's attendance at the trial.

Trial counsel was correct that the K9 unit officer's testimony would not have aided Mason in his defense, as shown by the officer's testimony at the motion for new trial hearing. The officer testified that his dog does not "scent discriminate," meaning that his dog can successfully track only where one dominant odor is present, as in an open wooded area, not in places where lots of people are present. Thus, according to the officer, in cases like the present one where there were many officers at the crime scene, it "ruins any tracking" by his dog.

In light of counsel's testimony presented at the new trial hearing, it is clear that his decision not to secure the K9 unit officer as a witness and instead rely on the stipulated incident report was a matter of reasonable trial strategy and did not constitute deficient performance. Moreover, Mason is unable to show that he was prejudiced by his trial counsel's failure to secure the officer as a witness, given that the officer's testimony at the new trial hearing shows that his trial testimony would not have been favorable to the defense. Consequently, Mason cannot carry his burden of establishing either prong of the *Strickland* test. See *Bradley v. State*, 322 Ga. App. 541, 547-548 (3) (b) (745 SE2d 763) (2013) (decision not to subpoena witness was

strategic and thus not deficient where counsel determined that the witness "would not have been helpful" and "was negative"); *Taylor*, 318 Ga. App. at 117 (2) (a) (defendant failed to show that tactical decision not to call witness was deficient or prejudicial).

(b) Mason further argues that his trial counsel was ineffective for failing to object when the State elicited certain testimony from Degraffenreaidt regarding the theft of his wallet and other personal items. We disagree and conclude that counsel's failure to object did not constitute deficient performance because an objection would have been meritless.

As previously discussed, the wallet containing the driver's license of Degraffenreaidt and a Strayer University identification card that had his name but Mason's photo on it were found in the bathtub where Mason had fallen through the ceiling of the vacant townhouse. The two checks which formed the basis for the forgery charges and which were made payable to Degraffenreaidt also were found in the bathtub.

Degraffenreaidt testified that he had never before seen the forged checks, that he did not know Mason or the check owners, and that his wallet had been stolen from the armrest in his car "probably around June" of 2011. Degraffenreaidt further

18

testified that the items taken from his wallet included his driver's license, his Strayer University identification card, and his personal and company American Express credit cards, which had been used to run up approximately $1,000 in expenses. Additionally, Degraffenreaidt testified that two checks were taken out of his checkbook kept in his car, which had been forged with his name, made payable to Mason, and had been cashed.

Mason argues that his trial counsel should have objected to Degraffenreaidt's testimony regarding his stolen American Express cards and his stolen personal checks made payable to Mason because these were allegations of additional, uncharged criminal offenses and thus was inadmissible. According to Mason, if the State wanted to introduce this testimony, it should have followed the procedures for admission of similar transaction evidence set forth in Uniform Superior Court Rule 31.3 and *Williams v. State*, 261 Ga. 640, 642 (2) (h) (409 SE2d 649) (1991), which the State failed to do.

> The general rule is, that, on a prosecution for a particular crime, evidence which in any manner shows or tends to show that the accused has committed another crime *wholly independent from* that for which he is on trial is irrelevant and inadmissible. However, an exception exists where evidence of other criminal transactions is a part of the res gestae or tends to show motive, or to show a course of conduct pointing toward

19

and leading to the crime. Moreover, declarations and circumstances forming a part of the continuation of the main transaction are admissible as res gestae.

(Punctuation and footnotes omitted; emphasis in original.) *Rogers v. State*, 292 Ga. App. 90, 93 (2) (663 SE2d 789) (2008).[1] Evidence that qualifies as part of the res gestae does not constitute similar transaction evidence requiring notice and a hearing. See *Smith v. State*, 302 Ga. App. 128, 131 (1) (a) (690 SE2d 449) (2010); *Rogers*, 292 Ga. App. at 93 (2).

The theft of the American Express cards and personal checks about which Degraffenreaidt testified were not "wholly independent" from the forgery crimes charged in the present case. Rather, evidence of the theft of these items by Mason established that Mason had stolen Degraffenreaidt's identity and thus linked Mason to the two forged checks at issue and explained why Degraffenreaidt's name appeared on those checks. As such, the theft of the American Express cards and personal checks were part of Mason's course of conduct pointing toward and leading up to

---

[1] Because this case was tried in March 2012, the new Georgia Evidence Code does not apply. See Ga. Laws 2011, Act 52, § 101 ("This Act shall become effective on January 1, 2013, and shall apply to any motion made or hearing or trial commenced on or after such date.").

Mason's forgery of the two checks using Degraffenreaidt's name and were aspects of the same criminal scheme.

Under these circumstances, Degraffenreaidt's testimony was part of the res gestae of the forgery offenses and did not constitute similar transaction evidence requiring notice and a hearing. See *Rogers*, 292 Ga. App. at 93 (2). See also *Chandler v. State*, 311 Ga. App. 86, 89-90 (3) (714 SE2d 597) (2011) (evidence of other crimes admissible "because they showed the planning process for the forgeries in question"); *McKenzey v. State*, 127 Ga. App. 304, 304-305 (2) (193 SE2d 226) (1972) (prior burglary associated with credit card forgery for which defendant was charged was admissible because it was not a "transaction independent" from the use of the forged card). It follows that the trial court did not err in admitting Degraffenreaidt's testimony. Because any objection to the admission of the testimony would have been meritless, Mason cannot show that his trial counsel was deficient for failing to object and thus cannot establish his ineffective assistance claim. See *Henry v. State*, 279 Ga. 615, 617 (3) (619 SE2d 609) (2005) ("Failure to make a meritless objection cannot be evidence of ineffective assistance.") (citations and punctuation omitted).

(c) When the State introduced certified copies of Mason's prior convictions for impeachment purposes during his cross-examination, the copies included the

sentences for those convictions. Mason argues that his trial counsel was ineffective for failing to object to the admission of the sentencing sheets as part of the proof of his prior convictions. According to Mason, the sentences imposed for his prior convictions had no relevance to this case, were unnecessary to prove the existence of the convictions, and were highly prejudicial. Pretermitting whether admission of the sentences was improper and whether Mason's trial counsel was deficient for failing to object, we conclude that Mason cannot show prejudice resulting from their admission.

During his direct examination, Mason admitted that he had several prior convictions and had spent time in prison. Indeed, central to Mason's defense was that he had decided to hide in the attic of the vacant townhouse upon seeing the police not because he was involved in a burglary scheme, but because he had prior theft-related convictions, had spent two years in prison for burglary, and was scared of being seen in the townhouse because he was on probation. Furthermore, as previously discussed, the State introduced similar transaction evidence of prior crimes committed by Mason, the admission of which he does not challenge on appeal.

Given these circumstances, there is no reasonable probability that trial counsel's failure to object to the admission of the sentencing sheets had any impact

on the jury's verdict. See *Daniel v. State*, 292 Ga. App. 560, 563-564 (4) (a) (665 SE2d 696) (2008) (trial counsel's failure to object to admission on cross-examination of sentencing sheets as part of prior convictions was not prejudicial, where defendant already admitted to the prior convictions on direct examination). See also *Hoffler v. State*, 292 Ga. 537, 540 (2) (739 SE2d 362) (2013) (admission of prior conviction to impeach witness was harmless, where witness "made an unsolicited reference to his 'rap sheet'" during his testimony and thus there was "other evidence before the jury of [the witness's] criminal record"); *Harris v. State*, 279 Ga. 522, 527 (5) (615 SE2d 532) (2005) (admission of defendant's prior convictions was harmless in light of defendant's admissions during his testimony before the State brought up his convictions). Consequently, because Mason cannot establish prejudice, he cannot succeed on his ineffective assistance claim.

4. Lastly, Mason argues that the trial court erred in allowing the State to introduce, over objection that they were unduly prejudicial, several of his prior convictions for impeachment purposes. Pretermitting whether the admission of the prior convictions was improper, we conclude that their admission was harmless for the same reasons discussed supra in Division 3 (c).

*Judgment affirmed. Miller and Ray, JJ., concur.*

23