A02A2148. DOUGHERTY v. THE STATE.
(578 SE2d 256)

RUFFIN, Presiding Judge.

A jury found Edward Dougherty guilty of driving under the influence of alcohol.[1] Dougherty appeals, arguing that the trial court should have suppressed the results of his Intoxilyzer 5000 breath test. He also asks us to remand this case to the trial court for a hearing on alleged illegalities in the jury's composition. For reasons that follow, we affirm.

1. In three enumerations of error, Dougherty argues that the trial court erred in refusing to suppress evidence of his breath test. We find no error.

(a) First, Dougherty claims that the test results were inadmissible because the police lacked probable cause to arrest him. In reviewing the trial court's denial of his motion to suppress, "we must construe the evidence most favorably to uphold the findings and judgment of the trial court, and that court's findings as to disputed facts and credibility must be adopted unless clearly erroneous."[2]

Viewed in this light, the record shows that, on April 27, 2000, Officer Scott Schunk saw Dougherty driving at a high rate of speed on Highway 316. Schunk paced Dougherty's vehicle at 80 mph in a

---

[1] The State charged Dougherty with driving under the influence to the extent that he was less safe to drive and driving while having an alcohol concentration of 0.10 grams or more. The jury found him guilty of both offenses, and the trial court merged the counts at sentencing.

[2] (Punctuation omitted.) *Strickland v. State*, 240 Ga. App. 604 (524 SE2d 305) (1999).

55-mph speed zone and at over 85 mph in a 65-mph zone. He then stopped Dougherty for speeding. .

During the traffic stop, Schunk noticed that Dougherty's eyes were bloodshot and watery, his face was flushed, his speech was slurred, and his breath smelled like alcohol. Schunk asked Dougherty to get out of his vehicle, and when Dougherty complied, Schunk observed that he was "very unsteady on his feet." At that point, Dougherty admitted that he had consumed four beers.

Schunk administered several field sobriety tests to Dougherty. He first instructed Dougherty to recite the alphabet. Dougherty completed the task, but did so slowly. Schunk also gave Dougherty the horizontal gaze nystagmus test, and Dougherty exhibited all six "clues." Finally, Dougherty blew into an Alco-sensor, which registered positive for alcohol. Based on his observations of Dougherty, as well as Dougherty's performance on the field tests, Schunk arrested him for driving under the influence to the extent that he was less safe to drive. After the arrest, Schunk tested Dougherty's breath for alcohol using the Intoxilyzer 5000. Two breath samples produced blood alcohol levels of 0.124 and 0.132.

"The test of probable cause requires merely a probability — less than a certainty but more than a mere suspicion or possibility."[3] Given Dougherty's physical appearance and demeanor, his field test performance, and the Alco-sensor reading, we agree with the trial court that probable cause existed for his arrest.[4] As we have previously held, an officer's observation that a motorist has "bloodshot, watery eyes and exude[s] an odor of alcohol [is] sufficient to show probable cause to arrest him for driving under the influence."[5] Accordingly, the trial court did not err in denying Dougherty's motion to suppress on this ground.

(b) Dougherty further claims that the trial court should have suppressed the breath test because the State failed to prove that Schunk's Intoxilyzer 5000 permit "was in an approved form." This argument also lacks merit.

A breath test is admissible under OCGA § 40-6-392 if, among other requirements, it is "performed . . . by an individual possessing a valid permit issued by the Division of Forensic Sciences [of the Georgia Bureau of Investigation] for this purpose."[6] At the suppres-

---

[3] (Punctuation omitted.) *Firsanov v. State*, 270 Ga. 873, 875 (3) (513 SE2d 184) (1999).

[4] See id.; *Strickland*, supra at 604-605; *Cann-Hanson v. State*, 223 Ga. App. 690-691 (1) (478 SE2d 460) (1996); see also *Keenan v. State*, 263 Ga. 569, 571 (2) (436 SE2d 475) (1993) (noting that " 'the alco-sensor is used as an initial screening device to aid the police officer in determining probable cause to arrest a motorist suspected of driving under the influence of alcohol' ").

[5] *Cann-Hanson*, supra at 691.

[6] OCGA § 40-6-392 (a) (1) (A).

sion hearing, Schunk testified that he received a permit to operate the Intoxilyzer 5000 from the Division of Forensic Sciences ("DFS") following a training course. The State also tendered a copy of Schunk's permit, which was issued on December 13, 1999, and expired December 12, 2001. The permit was signed by the Director of the DFS and the Commissioner of Georgia's Department of Public Safety.

Citing rules promulgated by the Georgia Bureau of Investigation ("GBI"), Dougherty argues that a valid Intoxilyzer 5000 permit must "be in a form approved by the Division of Forensic Sciences."[7] According to Dougherty, the State needed to present evidence — preferably through testimony from a DFS employee — that Schunk's permit was in an approved form. Because the State did not offer such evidence, Dougherty contends that it failed to prove Schunk held a valid permit.

The trial court rejected this argument, concluding from the face of Schunk's permit that it was in a form approved by the DFS. We find no error. The undisputed evidence shows that Schunk was trained on the Intoxilyzer 5000, and he received a permit from the DFS authorizing him "to perform chemical analyses of breath specimens" using that machine from December 13, 1999, to December 12, 2001. The permit was signed by the DFS director and contained all information required by the DFS regulations.[8] Given this evidence, the trial court properly concluded that Schunk possessed a valid permit to operate the Intoxilyzer 5000 on April 27, 2000.[9]

Moreover, to the extent Dougherty argues that his breath test results should have been suppressed because Schunk's permit did not technically comply with the DFS rules, his argument fails. The admissibility of a breath test does not depend on exact compliance with the DFS regulations.[10] Test results are admissible if the State shows substantial compliance with those rules, and the State demonstrated such compliance here.[11]

(c) Finally, Dougherty argues that his breath test results should have been suppressed because the State failed to prove that the DFS

---

[7] Ga. Comp. R. & Regs. r. 92-3-.05 (March 2000).

[8] See id. ("Permits will indicate the individual approved to perform analysis, an issue and expiration date, and the type of analysis either blood or breath approved to perform. In the case of breath analysis the type of instrument approved for use will also be indicated.").

[9] See *Prindle v. State*, 240 Ga. App. 461, 462-463 (2) (523 SE2d 44) (1999); *Koulianos v. State*, 192 Ga. App. 90-91 (2) (383 SE2d 642) (1989); see also *Williams v. State*, 224 Ga. App. 368, 370 (4) (481 SE2d 535) (1997) (where DFS director issues permit to conduct breath test on Intoxilyzer 5000, it may be inferred that the Intoxilyzer 5000 is an approved machine).

[10] See *Jarriel v. State*, 255 Ga. App. 305, 308 (3) (565 SE2d 521) (2002).

[11] See id.

promulgated satisfactory techniques and methods for such chemical testing. Under OCGA § 40-6-392 (a) (1) (A), the DFS must

> approve satisfactory techniques or methods to ascertain the qualifications and competence of individuals to conduct analyses [for alcohol in blood] and to issue permits, along with requirements for properly operating and maintaining any testing instruments, and to issue certificates certifying that instruments have met those requirements.

Dougherty argues that the DFS rules and regulations governing breath tests do not meet this requirement. In his view, the rules are open-ended and self-serving, allow officers to use unspecified instruments, do not set forth the testing procedures, and require only that the breath machine be checked and calibrated "periodically."[12]

We disagree. The rules specifically state that "[b]reath tests other than the original alcohol-screening test shall be conducted on an Intoxilyzer Model 5000."[13] Furthermore, although the rules refer to "periodic" calibration and testing of the Intoxilyzer, the testing takes place at the direction of the DFS director.[14] And the evidence shows that the DFS issued such a directive, ordering quarterly inspections and calibration, a requirement met by the Intoxilyzer 5000 in this case.[15] The rules also mandate that Intoxilyzer 5000 operators attend a breath analysis certification course.[16]

Dougherty insists that the rules should contain a more detailed description of the actual procedures used to operate and maintain the Intoxilyzer 5000. But he has provided no evidence that additional rules are necessary to ensure fair and accurate testing, and we find the techniques and methods approved by the DFS sufficient under OCGA § 40-6-392 (a) (1) (A). We further note that OCGA § 40-6-392 (a) (1) (A) provides only for the admissibility of the test results. A defendant remains free to challenge the weight and credibility of that evidence before the jury.[17] Accordingly, the trial court did not err in

---

[12] See Ga. Comp. R. & Regs. r. 92-3-.06 (5), (8).

[13] Id., r. 92-3-.06 (5).

[14] See id., r. 92-3-.06 (8) (a).

[15] We need not decide, and thus do not address, whether this testing directive constitutes an approved method or technique under OCGA § 40-6-392 (a) (1) (A). See *Jarriel*, supra (noting that "it is unclear" whether the quarterly testing requirement "constitutes a method approved by the GBI" under OCGA § 40-6-392 (a) (1) (A)).

[16] See Ga. Comp. R. & Regs. r. 92-3-.02 (2) (e); r. 92-3-.06 (12) (a).

[17] See *Jarriel*, supra (where State shows substantial compliance with DFS breath testing procedures, any deviation from those procedures goes to weight and credibility of the evidence); *Berkow v. State*, 243 Ga. App. 698, 701 (534 SE2d 433) (2000) (physical precedent only) ("[A]lthough an accused can always introduce evidence of the possibility of circumstances that might cause error in the test results, such evidence relates to the weight rather than the admissibility of the test results.").

refusing to suppress the Intoxilyzer 5000 test results on this ground.[18]

2. Dougherty argues for the first time on appeal that the jury in his case was not lawfully composed. According to Dougherty, he discovered this problem in jury composition after filing his notice of appeal. He contends, therefore, that we must remand the case to the trial court for a hearing on whether his trial was "a nullity."

" 'This Court is a court for the correction of legal errors and has no jurisdiction to address issues that are raised for the first time on appeal.' "[19] Thus, we cannot consider Dougherty's arguments regarding the jury composition.[20] Furthermore, Dougherty has cited no authority for his claim that we must direct the trial court to hold a hearing on this issue, and we decline to do so.[21]

*Judgment affirmed. Barnes and Adams, JJ., concur.*

DECIDED FEBRUARY 12, 2003.

*Clark & Towne, David E. Clark,* for appellant.
*Gerald N. Blaney, Jr., Solicitor-General, Gary S. Vey, Assistant Solicitor-General,* for appellee.

---

[18] See *Rowell v. State*, 229 Ga. App. 397-398 (1) (a) (494 SE2d 5) (1997).
[19] *Scott v. State*, 243 Ga. App. 334, 337 (4) (533 SE2d 428) (2000).
[20] See id.
[21] Under Georgia law, "[a] challenge to the array of the petit jury which is not raised until after the trial : . . is not timely." *Clark v. State*, 255 Ga. 370, 373 (2) (338 SE2d 269) (1986). We express no opinion as to whether Dougherty has an avenue for raising this otherwise untimely objection in the trial court. See, e.g., OCGA § 9-14-42 (b) ("The right to object to the composition of the grand jury or trial jury will be deemed waived [for purposes of a habeas corpus proceeding] unless the person challenging the sentence shows in the petition and satisfies the court that cause exists for his being allowed to pursue the objection after the conviction and sentence have otherwise become final.").